*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNIVERSITY OF MICHIGAN REGENTS,

        Plaintiff-Appellant,

v

VICTOR P. VALENTINO,

        Defendant-Appellee.

UNPUBLISHED
December 29, 2020

No. 349942
Washtenaw Circuit Court
LC No. 16-001122-CK

Before: LETICA, P.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

Plaintiff appeals as of right the judgment of the trial court permitting defendant to retain money as an attorney fee from no-fault insurance benefits paid on behalf of his client, Larry Reed. Plaintiff contends on appeal that the trial court misunderstood the Michigan Supreme Court's remand order in this case, that the trial court erred in summarily dismissing plaintiff's claim of conversion against defendant, and that the trial court erred in concluding that defendant had a valid charging lien that attached to the funds at issue. We reverse and remand for proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In a former appeal, we briefly summarized the relevant facts as follows:

> Larry Reed was catastrophically injured in an automobile accident. He was transported to the University of Michigan hospital, where he stayed for a lengthy period and was given medical treatment. Reed had a valid no-fault insurance policy with the American Automobile Association (AAA).

> Victor Valentino, a personal-injury attorney and the principal of defendant, met with Reed in the hospital. Reed retained defendant to assist him with his no-fault insurance claim. Defendant's retainer for representation included a one-third contingency fee "of the net recovery . . . received through suit, settlement, or in any other manner." Defendant wrote to AAA asserting an attorney's lien on the proceeds of the no-fault insurance claim.

-1-

Plaintiff began sending medical bills to AAA, and AAA initially sent payment for those bills directly to plaintiff. Upon being reminded of defendant's attorney's lien, AAA then began forwarding payments for healthcare expenses to defendant, using two-party checks listing both plaintiff and defendant as payees. One check in particular was for $280,953.99 (Check 18). Defendant tried to negotiate with plaintiff for a reduced amount for payment of Reed's medical bills, with the intention that defendant would retain the remainder as its attorney fee pursuant to its contingency-fee agreement with Reed. Plaintiff indicated that it expected full payment of its bills.

Plaintiff then filed a five-count complaint alleging conversion, tortious interference with a contract, claim and delivery, declaratory relief, and injunctive relief. After plaintiff initiated the lawsuit, defendant sent plaintiff a check for two-thirds of Check 18, retaining one-third of the amount as its attorney fee.

Defendant then filed a motion for summary disposition. The trial court granted defendant's motion, finding that plaintiff had no right to the payments from AAA and had no cause of action against defendant. [*Univ of Mich Regents v Valentino*, unpublished per curiam opinion of the Court of Appeals, issued May 29, 2018 (Docket No. 339198), pp 1-2, rev'd 503 Mich 986 (2019).]

Plaintiff appealed to this Court arguing "that defendant had no right to the no-fault payments made by AAA because plaintiff was entitled to the insurance proceeds." *Id*. at 2. This Court concluded that *Covenant Med Ctr, Inc v State Farm*, 500 Mich 191; 895 NW2d 490 (2017), was dispositive, and that according to *Covenant*, "the no-fault act does not refer to, or even contemplate, allowing a healthcare provider to have a statutory entitlement to no-fault insurance proceeds." *Id*. This Court noted that plaintiff had no actual claim to the insurance proceeds under the no-fault act, that Reed was the only person entitled to the proceeds as the injured party, and that plaintiff could still pursue the remainder of Reed's medical bills from him directly. *Id*.

Shortly thereafter, plaintiff appealed to our Supreme Court, who vacated this Court's opinion. *Univ of Mich Regents v Valentino*, 503 Mich 986, 986 (2019). Our Supreme Court noted:

The Court of Appeals found this Court's decision in *Covenant* . . . "dispositive." *Covenant* held that a healthcare provider possesses no statutory cause of action against an insurer for recovery of PIP benefits. Plaintiff is a healthcare provider. But the plaintiff is not seeking payment from an insurance provider for no-fault benefits under a statutory no-fault theory. Rather, the plaintiff's complaint alleges a common-law tort—conversion—against the defendant, an attorney, based on the defendant's retention of one-third of the funds from a check that was made payable directly to *both* plaintiff and defendant. Although a healthcare provider has no statutory cause of action against an insurer to compel payment under the no-fault act, the act permits insurers to directly pay healthcare providers on the insured person's behalf. MCL 500.3112. The insurer did so here. "[I]f an instrument is payable to 2 or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced *only by all of them*." MCL 440.3110(4) (emphasis added). Thus, the plaintiff, as joint payee, had a right to control the

funds. *Covenant* is not dispositive on the question presented here. We REMAND this case to the Washtenaw Circuit Court for further proceedings not inconsistent with this order. [*Valentino*, 503 Mich at 986 (second alteration in original).]

On remand, the trial court again dismissed plaintiff's claim of conversion, noting that, by placing the funds in his IOLTA account, there was no evidence that defendant ever intended to wrongfully retain any portion of the funds at issue. The court also held, however, that the remand order from the Supreme Court required it to issue a judgment in favor of plaintiff. The court thus entered an order requiring defendant pay the $98,443.07 that remained in his IOLTA account. However, following motions for reconsideration from both parties, the trial court affirmed its dismissal of plaintiff's claim of conversion[1] but reversed its decision to award the disputed money to plaintiff on the basis of a finding that defendant had a valid and enforceable charging lien that attached to the money. The trial court then ordered that defendant could keep the money as an attorney fee for his services. This appeal followed.

## II. STANDARDS OF REVIEW

The trial court dismissed plaintiff's conversion claim on the basis of defendant's original motion for summary disposition made under MCR 2.116(C)(10). "We review de novo a circuit court's resolution of a summary disposition motion." *Spectrum Health Hosps v Mich Assigned Claims Plan*, 330 Mich App 21, 30; 944 NW2d 412 (2019). "Summary disposition is appropriate under Subrule (C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id*. (quotation marks and citation omitted). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Spectrum*, 330 Mich App at 31 (quotation marks and citation omitted).

The trial court's additional determinations regarding the charging lien and priority of claim to the funds at issue were made on the basis of the parties' motions for reconsideration. "We review a trial court's decision on a motion for reconsideration for an abuse of discretion." *Woods v SLB Prop Mgt, LLC*, 277 Mich App 622, 629; 750 NW2d 228 (2008). "An abuse of discretion occurs if the trial court's decision falls outside the range of principled outcomes." *Macomb Co Dep't of Human Servs v Anderson*, 304 Mich App 750, 754; 849 NW2d 408 (2014). We also review the trial court's decision to impose an attorney's lien for an abuse of discretion. *Reynolds v Polen*, 222 Mich App 20, 24; 564 NW2d 467 (1997). However, "[w]hether a lien is authorized in a particular case is a question of law" that we review de novo. *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 281; 761 NW2d 761 (2008).

---

[1] The court noted that it may have created confusion by referring to defendant's intent in its initial order because intent is not an element of conversion. Notwithstanding, the court maintained that none of defendant's actions were wrongful, and thus plaintiff did not have a valid claim.

-3-

## III. THE REMAND ORDER

As a preliminary matter, plaintiff first contends that the trial court's decision to award the funds at issue to defendant was inconsistent with the Michigan Supreme Court's remand order. We disagree.

Plaintiff contends that the trial court violated the order by basing its decision on *Covenant Med Ctr, Inc v State Farm*, 500 Mich 191; 895 NW2d 490 (2017), which the Supreme Court expressly held was inapplicable to the case. However, it is clear from the trial court's opinion and order that its decision was not based on *Covenant*, but rather on the trial court having determined that defendant had a valid charging lien that attached to the funds. Plaintiff also asserts that, by vacating this Court's decision affirming the trial court, the Supreme Court necessarily intended to grant a judgment in favor of plaintiff. This reasoning lacks merit. If the Supreme Court felt that plaintiff was legally entitled to the funds at issue, the Court would have said so. Instead, the Court remanded to the trial court for further proceedings. *Valentino*, 503 Mich at 986.

## IV. CONVERSION

Plaintiff contends that the trial court erred in dismissing its claims of common law and statutory conversion against defendant. We agree.

"Under the common law, conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 346; 871 NW2d 136 (2015) (quotation marks and citation omitted). "While the tort of conversion originally required a separate showing that the converter made some use of the property that amounted to a total deprivation of that property to its owner, by the twentieth century common-law conversion more broadly encompassed *any* conduct inconsistent with the owner's property rights." *Id*. at 353 (emphasis added). In Michigan, our Supreme Court adopted the Restatement of Torts, which exemplified when common law conversion can be said to have occurred:

"A conversion may be committed by

(a) intentionally dispossessing another of a chattel,

(b) intentionally destroying or altering a chattel in the actor's possession,

(c) using a chattel in the actor's possession without authority so to use it,

(d) receiving a chattel pursuant to a sale, lease, pledge, gift or other transaction intending to acquire for himself or for another a proprietary interest in it,

(e) disposing of a chattel by sale, lease, pledge, gift or other transaction intending to transfer a proprietary interest in it,

(f) misdelivering a chattel, or

-4-

> (g) refusing to surrender a chattel on demand." [*Id*. at 352, quoting *Thoma v Tracy Motor Sales, Inc*, 360 Mich 434, 438; 104 NW2d 360 (1960).]

"The common law secures th[e] right to personal property by allowing someone wrongfully deprived of his or her own property to recover either that property or monetary damages, or both, for the wrongful deprivation." *Aroma Wines*, 497 Mich at 348. Notably, however, "[t]o support an action for conversion of *money*, the defendant must have an obligation to return the specific money entrusted to his care." *Head v Phillips Camper Sales & Rental, Inc*, 234 Mich App 94, 111; 593 NW2d 595 (1999) (emphasis added). This Court has determined that cashing a check can satisfy the "specific money" requirement. "An action for conversion lies where an individual cashes a *check* and retains the full amount of the check when he is entitled to only a portion of that amount." *Citizens Ins Co v America v Delcamp Truck Ctr, Inc*, 178 Mich App 570, 576; 444 NW2d 210 (1989).[2]

> Statutory conversion is codified at MCL 600.2919a, which provides:
>
> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
>
> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

---

[2] MCL 440.3420(1) provides:

> The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (*i*) the issuer or acceptor of the instrument or (*ii*) a payee or endorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee.

With specific regard to subsection (*ii*), we note the Uniform Commercial Code Comment, which provides that "[i]f a check is payable to more than one payee, delivery to one of the payees is deemed to be delivery to all of the payees." MCL 440.3420, UCC Comment 1.

(2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

Unlike modern, common-law conversion, statutory conversion always requires "that the conversion was to defendant's 'own use,' " which in turn means that the property "must be used for a purpose personal to the converter." *Aroma Wines*, 497 Mich at 356-358. " '[T]o the other person's own use' requires a showing that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Id*. at 358-359.

In this case, the trial court initially held on remand that plaintiff's conversion claim lacked merit because there was no evidence that defendant ever intended to wrongfully retain any portion of the funds at issue. Following plaintiff's motion for reconsideration, wherein plaintiff noted that intent was not an element of conversion, the trial court restated its conclusion as having been that both common law and statutory conversion require a "wrongful" act of dominion over the property of another, and that defendant committed no such wrongful act. Irrespective of defendant's intent, the court found nothing wrongful about his action of depositing the check at issue into his IOLTA account.

First, with respect to statutory conversion, the parties dispute whether defendant's deposit of the check into his IOLTA account satisfies the requirement that a defendant convert the check proceeds to its "own use." Our Supreme Court has explained that to fulfil this element of statutory conversion under MCL 600.2919a(1)(a), a plaintiff "must show that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Aroma Wines*, 497 Mich at 359. This is a "broad" definition. *Id*. In *Aroma Wines,* the Supreme Court noted that a jury could reasonably determine that the defendant used the converted property—wine, in that case—as "leverage" against the plaintiff in the parties' underlying feud regarding the payment of storage fees. *Id*. at 361.

So too here. Although we reject plaintiff's suggestion that defendant intended an "extortion," the evidence supports that by placing the money in his IOLTA account, defendant intended to gain an advantage over plaintiff. Another way of putting this is that plaintiff has created a fact question regarding whether defendant intended to use the money in the IOLTA account as leverage to gain a share for himself.[3] We take no position in this regard other than to find that a question for the jury exists. As in *Aroma Wines*, plaintiff has alleged facts that if accepted by a jury, could confirm that defendant converted the proceeds of the check to his own use.

---

[3] A bird in the hand is said to be worth two in the bush. With the proceeds in his account, defendant positioned himself to claim an entitlement to at least some of the money as the result of what he claimed was a valid attorney fee lien. And although the account into which defendant deposited the finds is a form of trust account, defendant directed and controlled the disposition of the funds within it.

Material issues of fact also exist regarding whether defendant's act of depositing the check itself into his IOLTA account constituted an act of common-law conversion. The Supreme Court has directed us to MCL 440.3110(4), which provides:

> If an instrument is payable to 2 or more persons alternatively, it is payable to any of them and may be negotiated, discharged, or enforced by any or all of them in possession of the instrument. If an instrument is payable to 2 or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced only by all of them. If an instrument payable to 2 or more persons is ambiguous as to whether it is payable to the persons alternatively, the instrument is payable to the persons alternatively.

Defendant's own testimony provides that the check at issue was payable to both plaintiff *and* defendant, not alternatively. Michigan caselaw provides that "[w]hen the word 'and' separates the names of two payees on an instrument, the instrument is payable jointly and not alternatively." *Pamar Enterprises, Inc v Huntington Banks of Mich*, 228 Mich App 727, 732; 580 NW2d 11 (1998). Defendant further conceded that he had neither permission nor an endorsement from plaintiff to deposit the check because defendant did not feel either were needed. Accordingly, defendant's own testimony suggests that he violated MCL 440.3110(4) when he deposited the check into his IOLTA account without plaintiff's authorization, and thus an argument could be made that defendant wrongfully exerted his dominion over the property to the exclusion of plaintiff's rights.

Notably, had plaintiff only alleged that defendant converted the *money* at issue, we are admittedly less confident a claim of common-law conversion could stand. See *Head*, 234 Mich App at 111 (explaining that an action for common-law conversion of money requires the defendant to have had "an obligation to return the specific money entrusted to his care"). However, defendant engaged in a different act: he apparently negotiated a check that he was legally not authorized to negotiate on his own, as the check was made out to two payees and required two signatures. See MCL 440.3420. In *Trail Clinic, PC v Bloch*, 114 Mich App 700, 705; 319 NW2d 638 (1982), we observed that "[c]hecks are considered to be the property of the designated payee and may be the subject of a suit for conversion." Where there are two payees, a check is the property of both, and is converted if only one payee endorses and deposits it.

Moreover, even had defendant properly deposited the check in his IOLTA account, we discern no right on defendant's part to *deliver* the money to himself. Absent a valid attorney's lien, which we conclude below was not present in this case, defendant was not entitled to keep any of the funds in this case in an account under his sole control. As is further detailed below, there was no real dispute between the insurer and the medical provider in this case, and to that end, there appears to have been no dispute between those entities as to the purpose and intended beneficiary of the check at issue. Defendant was added as a co-payee on the check only after he demanded it based on his fiduciary relationship with Reed. AAA complied because doing so when a patient is represented by an attorney is customary. After becoming a co-payee with plaintiff, defendant proceeded to keep the money in his IOLTA account based on a highly suspect attorney's lien.

-7-

Lastly, we note defendant's argument that his actions were not only permissible, but required by the Michigan Rules of Professional Conduct. The argument is without merit. MRPC 1.15 provides, in pertinent part:

> (c) When two or more persons (one of whom may be the lawyer) claim interest in the property, it shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute.

> (d) A lawyer shall hold property of clients or third persons in connection with a representation separate from the lawyer's own property. All client or third person funds shall be deposited in an IOLTA or non-IOLTA account. Other property shall be identified as such and appropriately safeguarded. [MRPC 1.15(c) and (d).]

Defendant has not pointed to any caselaw—nor were we able to find any caselaw—to suggest that MCL 440.3110(4) is not implicated by an attorney depositing funds into an IOLTA account. Nor would it seem logical that an attorney could overcome the requirements of MCL 440.3110(4) by simply depositing any check bearing his name into an IOLTA account. That is, simply because defendant believed he was entitled to some of the funds at issue did not permit him to improperly negotiate the check in order to place those funds into his IOLTA account.

For the above reasons, it would seem clear that questions of fact sufficient to overcome summary disposition exist as to whether defendant's act of depositing the jointly-issued check into his IOLTA account constituted acts of statutory and common-law conversion. Accordingly, the trial court erred by dismissing those counts of plaintiff's complaint.

## V. THE CHARGING LIEN

Plaintiff also contends that the trial court erred in concluding that a charging lien was authorized under the facts of this case. We agree.

A "charging lien is an equitable right to have the fees and costs due for services secured out of the judgment or recovery in a particular suit." *Souden v Souden*, 303 Mich App 406, 411; 844 NW2d 151 (2013) (quotation marks and citation omitted). A charging lien "creates a lien on a judgment, settlement, or other money recovered as a result of the attorney's services." *George v Sandor M Gelman, PC*, 201 Mich App 474, 476; 506 NW2d 583 (1993).

> The attorney's charging lien exists as part of the court's inherent power to oversee the relationship of attorneys, as officers of the court, with their clients. It does provide a means of securing the legitimate interest of the attorney in payment for his services and expenses on behalf of the client, but it is subject to the control of the court for the protection of the client and third parties as well. [*Souden*, 303 Mich App at 411 (quotation marks and citation omitted).]

Plaintiff primarily relies on *Miller v Citizens Ins Co*, 288 Mich App 424, 426; 794 NW2d 622 (2010), aff'd in part and reversed in part 490 Mich 905 (2011), and *Garcia v Butterwoth Hosp*, 226 Mich App 254, 256; 573 NW2d 627 (1997), for the contention that there was no valid charging lien in this case.

In *Miller*, the Detroit Medical Center (DMC) appealed "an order granting attorney fees to [the] plaintiff's attorneys that had the effect of proportionately reducing the amount the DMC recovered for billed services" under the no-fault act. *Miller*, 288 Mich App at 426. Quite similarly to this case, the DMC contended that it had provided medical, surgical and rehabilitative services to the plaintiff, and that the plaintiff's attorneys were seeking from the DMC 1/3 of the money owed as attorney fees. *Id.* at 429. The DMC contended that the "plaintiff's attorneys were not entitled to fees from no-fault benefits earned by the DMC when no attorney-client relationship existed between them." *Id.* at 433. This Court held, however, that the "dispositive attorney-client relationship that entitled [the] plaintiff's attorneys to fees for representing [the] plaintiff . . . was the attorney-client relationship that existed between [the] plaintiff and her attorneys." *Id.* This Court reasoned:

> [The] plaintiff's attorneys had a right to be paid for their services from the amount recovered from [the insurer] pursuant to their contingency fee agreement with [the] plaintiff. This may appear at first blush to be unfair to the medical providers, who provided medical care only to be asked—almost required—to reduce their bills to pay, in part, for the expense of litigation. It is not unfair. As a consequence of plaintiff's attorneys' actions, [the insurer], which had denied the application for benefits entirely, agreed to pay personal protection insurance benefits on [the plaintiff's] behalf. If [the insurer] had not agreed to do so, it is doubtful that [the plaintiff's] medical providers would have received as much in settlement of their bills because Medicaid, [or the plaintiff], would have been the payer. And if [the] plaintiff had not retained attorneys to litigate this case, it might have been incumbent on each medical provider to retain counsel to litigate its claim on [the plaintiff's] behalf against [the insurer], which would also cause them to incur the expense of litigation. [*Id.* at 436-437.]

This Court noted: "An insured plaintiff who prevails in a litigation against the plaintiff's insurer secures payment not only for the plaintiff's benefit, but for the benefits of the plaintiff's medical providers, which were at risk of either not being paid or receiving a smaller fraction of their billed amounts for their services." *Id.* at 438.

On appeal to our Supreme Court, the Court reversed in part and affirmed in part. The Court affirmed that the plaintiff's attorneys had asserted an attorney's charging lien over the settlement proceeds, the effect of which was to settle claims as between the insurer, the plaintiff, and her attorney. *Miller v Citizens Ins Co*, 490 Mich 905, 905 (2011). The Court made clear, however, that this did not extinguish the DMC's contractual right to payment for its services, and noted that "[t]he circuit court's order of dismissal pursuant to the settlement agreement did not have the effect of extinguishing the DMC's right to collect the remainder of its bill from [the] plaintiff. Such a result could not have been achieved without an explicit waiver, or at least unequivocal acquiescence, by the DMC, which was not obtained." *Id.* Of course, it cannot be ignored that the factual basis for the Supreme Court's approval of the charging lien at issue in *Miller* is not present in this case. In *Miller*, the plaintiff's attorney was entitled to fees from the insurance proceeds because the same was consistent with the settlement agreement reached between the insurer and the plaintiff. See *Hurley Med Ctr v George R Hamo, PC*, unpublished per curiam opinion of the Court of Appeals, issued July 24, 2012 (Docket No. 304235), p 4. The purpose of the Supreme

Court's clarification was simply to say that the charging lien did not extinguish any right the DMC otherwise had to collect on its bills from plaintiff.

No settlement agreement existed in this case, nor was any litigation necessary. For that reason, plaintiff mostly relies on *Garcia*, wherein a medical provider appealed an award of attorney fees to a plaintiff's attorney from the no-fault benefits paid to the medical provider. *Garcia*, 226 Mich App at 256. Central to *Garcia* was that the insurer "agreed beforehand to pay for any treatment connected to plaintiff's accident," and subsequently "paid benefits without contesting them." *Id*. at 257. This Court noted that it appeared "that [the insurer and the medical provider] worked th[e] matter out between themselves, without the intervention of [the] plaintiff's attorney." *Id*. Under those circumstances, "no attorney fee was chargeable against the benefits payable to [the medical provider]." *Id*. Thus, *Garcia* stands for the proposition that a valid charging lien cannot exist where no-fault benefits were paid "without contest, the plaintiff brought [a] no-fault lawsuit only as a precautionary measure, the lawsuit was dismissed before the complaint was even served, and the insurer and health-care provider actually resolved the matter without the assistance of the plaintiff's attorney." *Miller*, 288 Mich App at 439. Again, there was no lawsuit in this case, and both plaintiff and the testifying representative of AAA agree that payment of Reed's benefits was resolved without defendant's assistance.

Defendant distinguishes *Garcia* by arguing that, in that case, the check was made payable only to the medical provider and not the attorney. While this fact implicates MCL 440.3110(4) as noted above, we fail to see and defendant does not explain how it impacts whether defendant performed services that would warrant a charging lien on the funds. Moreover, defendant's assertion appears to be incorrect, as the *Garcia* opinion notes that the insurer "issued three-party checks payable to [the] plaintiff, his attorney," and the medical provider. *Garcia*, 226 Mich App at 256. Defendant also argues, however, that unlike *Garcia*, defendant provided services in this case that were necessary to bring about AAA's payments.

Defendant contends that he spent between 100 and 150 hours on Reed's insurance claim culminating in a fee of "98 thousand dollars and some change." Defendant testified at his deposition that his work on the case consisted of making telephone calls, sending e-mails, obtaining and reviewing medical records, helping Reed fill out his initial paperwork for AAA, and explaining the law and no-fault benefits to Reed. Defendant also testified, however, that the documents he helped to procure—including an application for benefits, an affidavit of no health insurance, and an authorization for medical records—are documents often exchanged in the ordinary course of an insurance claim without the assistance of an attorney.

Perhaps most importantly, a representative of AAA testified at his deposition that plaintiff began submitting medical bills to AAA and the case was assigned to that particular AAA representative before defendant was ever involved in the case. Thereafter, AAA began voluntarily paying Reed's medical bills directly to plaintiff. AAA later began issuing joint checks to plaintiff and defendant only on the basis of defendant notifying AAA of his attorney's lien and subsequently requesting that the bills be sent to defendant's office, which AAA honored because the practice of doing so is common for attorneys representing injured people. The testifying AAA representative clarified that the joint checks were issued "not in recognition of legal services [defendant provided], but because he placed a lien."

The representative of AAA also testified that Reed's application for benefits had been completed prior to defendant's involvement, and that the authorization for medical records was not necessary because AAA had already been receiving the records from plaintiff directly with plaintiff's bills. With specific respect to Check 18, the AAA representative explicitly testified at multiple points throughout his deposition that defendant's involvement neither sped up nor delayed the processing of the check, and that defendant's services did not facilitate the payment of the bill. To summarize, the representative testified that Reed's claims were never disputed, that plaintiff submitted its bills and relevant medical records directly to AAA, and that AAA paid the no-fault benefits voluntarily without defendant's involvement.[4]

With all of that in mind, the trial court's reasoning for imposing the charging lien, including that defendant's services spared plaintiff the expense of litigation, and that it would be unfair to allow medical providers to benefit from such legal services when necessary to secure proceeds, does not comport with the available record. That is, the record does not support the trial court's conclusion that a charging lien attached to the funds at issue where the funds were payed voluntarily and independent of the services defendant offered. The trial court thus erred in finding that a lien was authorized under the facts of this case.[5]

## VI. CONCLUSION

The trial court erred in dismissing plaintiff's statutory and common-law conversion claims because taking the facts in a light most favorable to plaintiff suggests that defendant may have wrongfully deposited the check at issue into his IOLTA account without plaintiff's authorization. A jury will have to resolve whether the evidence satisfies the elements of either variety of conversion. Relatedly, the trial court also erred in concluding that a charging lien was legally authorized under the facts of this case.

---

[4] It is also worth noting that this Court has held before that the mere "filing of a no-fault application with the insurance company" was not sufficient for the purposes of asserting "a binding attorney's lien on . . . no-fault medical benefits." *In re L'Esperance Estate*, 131 Mich App 496, 502-503; 346 NW2d 578 (1984).

[5] As an aside, we note defendant's suggestion that plaintiff acted either fraudulently or unethically in obtaining an assignment of benefits in this case. The insinuation is not supported by the record, and in any event, AAA's representative testified that he never reviewed the document. We also agree with plaintiff's interpretation of the remand order, wherein the Supreme Court noted that AAA paid benefits voluntarily. *Valentino*, 503 Mich at 986. As it was not necessary for plaintiff to file any suit against AAA to obtain benefits on Reed's behalf, whether the assignment of benefits was enforceable was irrelevant to plaintiff's claim in this case.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher